UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------X
IN RE:                                                    Case No.: 15-43251 (NHL)
                                                          Chapter 11 Reorganization

BNOIS SPINKA,

                                    Debtor.
-------------------------------------------------------------X

**SUMMARY COVER SHEET FOR FINAL FEE APPLICATION OF LEO FOX, ESQ. AS COUNSEL TO THE DEBTORS AND DEBTORS-IN-POSSESSION FOR THE PERIOD FROM JULY 2015 THROUGH AND INCLUDING APRIL 2018**

<u>Summary</u>

| NAME OF APPLICANT: | Leo Fox, Esq. |
|---|---|
| ROLE: | Counsel to Debtors and Debtors-in-Possession for the period July 2015 through and including April 2018 |
| CURRENT APPLICATION: | Final Fees Incurred:  $485,330 plus $2,261,86 in disbursements (the Debtor and Fee Applicant have agreed to subject to Court Order to the payment of $300,000 payable over 48 months at the rate of $6,250 per month by post-dated checks issued at the time of the Fee Hearing) |
| TOTAL INTERIM PAYMENTS | $0 |
| BALANCE DUE FOR ALL PERIODS: | See Above.   Payments for post-confirmation litigation with the taxing authorities is not included |

This is a(n): _____interim        _X_ final application

<u>Summary by Professional</u>

(From July 2015 through and including April 2018)

| Name of Professional | Year Admitted to Practice | Hours | Rate | Amount |
|---|---|---|---|---|
| **PARTNERS** | 1977 | 723 | $450 | $322,267.50 |
| Leo Fox, Esq. | | | | |
| **ASSOCIATES** | | | | |
| Susan Adler, Esq. | 1993 | 222.4 | $275 | $60,897.50 |
| Stephanie Wessel, Esq. | 2009 | 309.6 | $325 | $100,620.00 |
| **PARAPROFESSIONALS** | | | | |
| Carol Brennan | | 20.6 | $75 | $1,545.00 |
| **Total** | | | | **$485,330** |

Dated:  New York, New York
May 7, 2018

Respectfully submitted,

/s/ Leo Fox
Leo Fox, Esq.
Attorney for Debtor-in-Possession
630 Third Avenue, 18th Floor
New York, New York 10017
(212) 867-9595
leo@leofoxlaw.com

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

--------------------------------------------------------x

IN RE:                                                    Chapter 11

BNOIS SPINKA,                                             Case No. 15-43251 (NHL)

                         Debtor.

--------------------------------------------------------x

**FINAL FEE APPLICATION OF LEO FOX, ESQ. AS COUNSEL TO THE DEBTOR
AND DEBTOR-IN-POSSESSION FOR THE PERIOD FROM JULY 2015
THROUGH AND INCLUDING APRIL 2018**

TO:    THE HONORABLE NANCY HERSHEY LORD
       UNITED STATES BANKRUPTCY JUDGE

      Leo Fox, Esq. ("Applicant"), counsel to Bnois Spinka the debtor and debtor-in-possession

in the above captioned case (the "Debtor"), pursuant to §§ 330 and 331 of Title 11 of the United

States Code (the "Bankruptcy Code"), Rule 2016 of the Federal Rules of Bankruptcy Procedure,

the Local Rules for the United States Bankruptcy Court for the Eastern District of New York,

the Amended Guidelines for Fees and Disbursements for Professionals in the Eastern District of New

York Bankruptcy Cases (the "Local Guidelines"), the United States Trustee Guidelines for

Reviewing Applications for Compensation and Reimbursement of Expenses Filed Under 11

U.S.C. § 330 (the "UST Guidelines," and together with the Local Guidelines, the "Guidelines"),

for the allowance of compensation for professional services rendered and reimbursement of

expenses incurred for the period through and including April 2018, respectfully represents:

      1.     These services were rendered pursuant to an order of this Court dated October 14,

2015 (**Exhibit A**), which authorized the retention of the Applicant on an hourly basis.

      2.     The Application reflects a total of $485,330 in fees plus $in disbursements for

services rendered during the period July 2015 through and including April 2018 (the

"Compensation Period").

3.      This case has 617 filings on the docket and the docket sheet is 162 pages long. Much of the documentation and preparation was generated by the Fee Applicant.

4.      The Applicant working with the Debtor and the extraordinary assistance by this Court, were able to achieve the confirmation of a Plan, payment of creditors, the continuation of schooling for some 700 students, the continuation of the good works of the synagogue and the substantial benefit to the local community by this Debtor's school's continuation

## PROCEDURAL BACKGROUND

5.      On July 16, 2015 (the "Petition Date"), the Debtor filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code. The Debtor continue in possession of its properties and management of their businesses as a debtor in possession pursuant to §§ 1107 and 1108 of the Bankruptcy Code.

6.      On December 4, 2015, the Office of the United States Trustee for the Eastern District of New York formed an Official Unsecured Creditors Committee.  On April 4, 2016, the Office of the United States Trustee for the Eastern District of New York appointed Forchelli Deegan Terrana LLP as attorneys for the official committee of unsecured creditors in this case (the "Creditors' Committee").

## THE CHAPTER 11 CASE

7.      The Debtor is a religious corporation organized under the Religious Corporation Law of the State of New York.

8.      The Debtor is in the business of owning and operating religious institutions, such as synagogues and schools, for its members out of three separate locations: (i) 127 Wallabout Street, Brooklyn, New York, a synagogue and girls' school with 115 girls ("Wallabout"), (ii) 795

Kent Avenue, Brooklyn, New York, a boys' school with 285 boys ("Kent"), and (iii) 5405 Route 42, South Fallsburg, New York, a summer camp ("Fallsburg").

9.      The Debtor's prepetition financial problems arose in connection with the Debtor's giving a mortgage to Presidential Bank FSB (referred to herein as "Presidential" the "Lender" or the "Bank") in March of 2007 in the amount of $3,075,000 for purposes of acquiring the Debtor's Fallsburg property.  The Fallsburg property operates as a retreat and camp in the summer months providing religious instruction for the members and the young students of the Debtor's synagogues and schools located in Brooklyn.  As part of that mortgage financing, the Debtor provided to the Bank a collateral mortgage upon the Debtor's headquarters located at Wallabout, among other property both real and personal. The monthly payments were approximately $23,000.  The Bank is secured by both the Wallabout and Fallsburg properties, rents derived from such properties and all personal property of the Debtor. The Debtor continued to make payments until on or about September 2008, when it began experiencing financial difficulties arising out of the credit crisis. Donations and tuition dried up as the members and other charitable persons began feeling the adverse effects of the financial difficulties in the United States at the time.  The Bank accelerated its loan.

10.      The Debtor and the Bank entered into a Forbearance Agreement.  The Debtor continued making payments.  However, in late 2012, the Debtor was required to expend funds to protect its installations in Brooklyn in conjunction with Hurricane Sandy.  This resulted in delayed payments to the Bank.

11.      Additionally, the Debtor had been involved in a dispute with the Town of Fallsburg (the "Town") regarding the payment of taxes.  The Debtor contended it was exempt and was not

required to pay taxes as a not-for-profit religious corporation using the premises for non-profit purposes.  The Town contended, however, that the Debtor was required to pay taxes.

12.     As a result of the above difficulties, the Debtor continued to fall behind in payments to the Bank.  In February 2013, the Debtor made a payment of approximately $22,000 in an effort to begin catching up on the loan.  In June 2013, the Bank commenced a foreclosure action.  During the negotiations with the Bank, the Bank obtained a judgment of foreclosure in February 2015.

13.     Negotiations commenced in early 2013 by the Debtor to settle the matter with the Bank.  The Debtor proceeded to seek funds from its congregants and others in order to raise funds to settle the debtor.   These proposals continued up through July 15, 2015.  There was a foreclosure sale scheduled for July 17, 2015.

14.     The Fee Applicant realized that the foreclosure would have spelled disaster for the Debtor and the end of its educational and learning activities.  The Fee Applicant immediately discussed the filing of a Chapter 11 case with the Debtor.  The Applicant explained the consequences including the immediate institution of an automatic stay which would freeze the foreclosure sale and give the Debtor some time to negotiate an arrangement with the Bank.

15.     The Fee Applicant immediately, on an emergency basis, obtained financial information and other items necessary to effect an emergency Chapter 11 filing.  The Fee Applicant prepared the papers and obtained the signatures of the Debtor as well as its Corporate Resolution.

16.     On July 16, 2015 the Debtor filed its Chapter 11 petition.  Immediately upon filing, the Fee Applicant discussed the essential operating and cash needs which were required by the Debtor to fund its activities.  The Applicant determined that there was a need for a cash management program which would enable the Debtor to continue to pay its government lunch and food programs despite the fact that a portion of the amounts which were due related to pre-petition

activities.  The Fee Applicant realized that the entitlements to the government program required full and immediate payment of any such amounts and the failure to make such payments would result in the government refusing to continue making payments on account of these government programs.  The Fee Applicant realized that these programs were absolutely essential to the Debtor's operations.

17.    The Fee Applicant prepared a number of first day motions to deal with these operational issues.  The Fee Applicant prepared a motion to pay priority payroll, cash management, and use of cash collateral to pay expenses, but the Bank objected to each of these applications. The Applicant obtained the relevant information and filed the Schedules and Statement of Financial Affairs.  Ultimately, and with the continued monitoring by the Bankruptcy Court, the Bank and the Debtor hammered out the budget and agreed to the terms which enabled the Debtor to operate.  Payments were made to the priority creditors over the next several months pursuant to Court Order.

18.    In the meantime, the Bank made a Motion for the appointment of a Chapter 11 Trustee.  The Applicant spoke with the Debtor and offered information and documents necessary to oppose the Motion.  The Applicant submitted an extensive opposition to the Motion.  At hearings before the Court, the Applicant argued against the Motion.  Ultimately, the Bank withdrew the Motion.  The Bank then served extensive Rule 2004 requests.  The Applicant responded to all the requests and delivered the documents to the Bank.  The Applicant also made motions to approve the bus transportation system (Doc. No. 206), obtaining funding for fundraisers dinners and enabling a number of other administrative functions of the Debtor.

19.    Thereafter, the litigation with the Bank centered around the Plan litigation.

20.     The Applicant also expended considerable time in dealing with the tax claims asserted on account of taxes and water and sewer charges upon the Debtor's Kent Avenue property. The Debtor sought financing from Cornell Realty to "take out" a prior lender.  The Debtor executed a "security deed" as additional collateral for the financing.  Cornell, in late 2011, filed the deed unknown to the Debtor and believed to be mistakenly filed.  The Debtor believed and posited that Cornell's recording of the Bargain and Sale Deed was improper because the Debtor properly performed and continued paying substantial sums to satisfy Cornell (leaving a balance of $322,000 due) and it represented a transfer of ownership of the Kent Property by a religious, not-for-profit corporation which transfer required the prior approval or authorization of a Court of competent jurisdiction or the Attorney General of the State of New York. Since such approval was not obtained and the Debtor complied with its obligations to this Creditor, the Debtor maintained that it currently was the lawful owner of the Kent Property, and that it has remained the rightful owner of the Kent Property from July 2006 through the present and was entitled to a deed that retroactively continued title in the name of the Debtor which would allow the Debtor's continued retention of the Kent Property as a tax exempt entity free of any real estate taxes.

21.     The City of New York and the Tax Lien Trusts appeared in 2017 and challenged the Debtor.  They filed objections to the Debtor's disclosure statements on the grounds *inter alia* that the Debtor could not establish that the Kent Property was tax exempt subsequent to Debtor's transfer of the Deed to Cornell on December 11, 2011 and therefore would be required to pay the substantial taxes and charges which were assessed by the City of New York of approximately $2,600,000 as of February 2018.  The Debtor, however, disagreed with this contention relying on all the circumstances here including the original transfer documents in December 2011.

22.    The Applicant commenced an Adversary Proceeding in 2017 seeking to determine that the Debtor did not owe taxes.  On September 13, 2017, the City of New York commenced an Adversary Proceeding to sustain the liens.  The Applicant researched the issues involved in the litigation.  The City made a Motion to dismiss the Debtor's Adversary Proceeding.  By Order dated December 29, 2017, the Court dismissed the Debtor's Adversary Proceeding without prejudice to the Debtor's right to assert its claims in the City Adversary Proceeding.

23.    The City's Adversary Proceeding sought to determine whether the automatic stay is applicable, in the First Cause of Action, (b) whether there existed a valid and enforceable indemnification obligation of the Debtor to Cornell under the Second Cause of Action, (c) whether the Debtor failed to exhaust administrative remedies, was time barred under § 505 and non-bankruptcy law, was estopped and guilty of laches and further declaring the validity and priority of the liens held by the NYC DOF and the Tax Lien Trusts over all other liens under the Third Cause of Action, and (d) declaring whether the Cornell and Landau Trust liens were valid and enforceable under the Fourth Cause of Action.   The Applicant prepared and filed an Answer with Counterclaims on December 12, 2017 in the City Adversary Proceeding and thereafter filed a document titled Amended Answer with Counterclaims and a Third-Party Complaint against the Tax Lien Trusts on January 4, 2018.  The City and the Tax Lien Trusts challenged the Debtor's claim that it filed a "Third-Party Complaint" against the Tax Lien Trusts.  The Appellant responded in extensive opposition to the tax creditors challenges.  At a pre-trial conference held on January 25, 2018 in the pending Adversary Proceeding the Court advised the Debtor that its Amended Answer was untimely and that it had to seek leave in order to file a third-party complaint.  Subsequently, the Applicant filed a Motion for Leave to file a timely Third-Party Complaint or to deem the existing Amended Answer with Counterclaims as the Third-Party Complaint.   The Court

granted the motion.  The Applicant requested another five days to decide whether it desires to file another amended pleading after which the Tax Lien Trusts and the City of New York would have twenty days to respond to such amended pleading.  The Applicant filed a Second Amended Answer.

24.    The Debtor proceeded with the Plan.

25.    In late 2017, Applicant prepared and submitted a Stipulation with Cornell to permit Cornell to return the Security Deed to the Debtor and to be paid $322,000, the balance of the secured claim.  The Applicant prepared a Motion to settle under Rule 9019 and appeared at the hearings to obtain approval of the settlement.  The Appellant responded to the objections filed by the tax lien creditors.  The Appellant and tax lien creditors continued to submit opposition proposed Orders approving the Cornell Settlement.  The Court entered its own Order.  The security deed was transferred back to the Debtor.

26.    The Debtor and the Applicant have provided, in the Plan, for the payment, or escrow, of distributions owed to creditors other than the Bank mortgagee and Cornell (the "Delayed Distribution Creditors") to, or in favor of, the NYC DOF, the Water Board and Tax Lien Trusts pending a determination of the issue in the City's Adversary Proceeding.

## PLAN

27.    In connection with the Motion for the Appointment of a Trustee, the Debtor determined to file a Chapter 11 Plan.  On December 8, 2015, the Debtor submitted a Plan which provided for payment to the Bank and the creditors in accordance with the provisions of § 1129.  On December 11, 2015, the Bank submitted its own Plan essentially providing for the liquidation sale of all of the assets of the Debtor.  Thereafter there ensued a whole series of competing Plan and Disclosure Statements.

28.     In the summer of 2016, the Court ordered a mediation between the Debtor and the Bank.  The Applicant submitted a status report on the mediation (Doc. No. 314).  The parties selected Lori Lapin Jones as mediator.  The Fee Applicant prepared the mediation statement and discussed potential proposals with the Debtor and the third-party financiers.  The mediation took place in the fall of 2016.  Although an agreement was tentatively reached at the mediation, that mediation was ultimately not successful due to, according to the Bank, the Debtor's inability to consummate the settlement.

29.     In 2017, the Debtor, Creditors Committee and the Bank entered into an extensive series of negotiations pursuant to which the Bank would receive $1,750,000 in cash and another $2,250,000 under Nota A for a total of $4,000,000 if the Debtor fully paid the loan on a timely basis.  This process had rigorous deadlines.  A Motion was made by the Applicant to approve the settlement and thereafter Applicant prepared the documentation on an emergency basis to meet the Bank imposed deadlines.  The deadline also contemplated a confirmation by April 15, 2018.  The Applicant also completed the modification of the Plan and Disclosure Statement.  The Applicant sent out the required notices for the Disclosure Statement and then for the confirmation.  The Applicant certified the Ballots and worked on the Confirmation Memorandum.  The Applicant dealt with the objections by the City on the Confirmation Date.  The Applicant participated in the confirmation process.

30.     On April 12, 2018, the Court confirmed the Debtor's Plan.  The Applicant prepared the Debtor with a "to do" list of post-confirmation actions.  The Applicant received the recent Notice of Appeal filed by the City.

## OTHER DUTIES

31.     Applicant rendered all other necessary services generally required by an attorney for a Debtor-In-Possession.

32.      Shortly, subsequent to the Chapter 11 filing, the Applicant advised the Debtor of the Debtor's duties under Chapter 11 and as to the requirements necessary for an acting Debtor-in-possession.  The Applicant prepared instructions and assisted in obtaining the necessary DIP accounts and tax accounts.  The Applicant also assisted and repeatedly discussed with the Debtor the obligations of the Debtor for the preparation of an operating statement format which was in conformance with the nature of the Debtor's business and consonant with the requirements of the United States Trustee.

33.     The Applicant attended the initial Debtor interview with the Debtor at the Office of the United States Trustee.  Similarly, the Applicant prepared the Debtor and attended the Section 341 meeting of creditors.  At that meeting, there was vigorous examination and cross-examination of the Debtor.

34.     The Applicant arranged for the retention of professionals consisting of the Applicant herein.   The Applicant prepared the Application, supporting Affidavit and proposed Order, and submitted such papers initially to the Office of the United States Trustee.  On December 4, 2015, the Office of the United States Trustee appointed an Official Committee of Unsecured Creditors (the "Committee") comprised of Trade Source International, R & L Food Dist. Inc., and David Ekstein.  The Committee has retained Forchelli Deegan Terrana LLP as its counsel, effective as of December 7, 2015, pursuant to Order entered April 5, 2016.  The Applicant reviewed the terms of the proposed retention.

35.     The Applicant had a number of discussions with the United States Trustee regarding the requirements for retention in particular regarding the retention requirements of special tax counsel and responded to the objections filed by the tax creditors.   The United States Trustee ultimately approved these retentions.   The Applicant filed these papers.   The Court approved these retentions.

36.     Applicant drafted and served its notice setting a bar date to which all the creditors had to file proofs of claim.  The Applicant submitted the Bar Date Order, Application and Notice to the Court.  The Court issued an Order providing for the Bar Date to be December 11, 2015, the Applicant arranged to distributing the bar date notice to all creditors and parties in this case and filed an Affidavit of Service regarding this matter.

37.     The Applicant proposed a proposed Order for the use of cash collateral and submitted budgets to the creditors.  The Applicant made a request for use at each hearing before the Court.  The Court approved uses and the Applicant then served the Order on creditors.

38.     In addition, the Applicant was required to, and engaged in advising the Debtor; conducting meetings and telephone conferences with the Debtor and creditors and the myriad of other matters required by an attorney for a Debtor-In-Possession.

39.     The Applicant has also rendered other general administrative services required by an attorney for a Debtor-in-possession in a Chapter 11 proceeding.  Periodically the Applicant would review the Court's files, to determine whether there existed papers with which the Applicant was not familiar.  The Applicant responded to creditor's inquiries concerning the status of the proceedings including discussing the status of the case with the Office of the United States Trustee as well as the Office of the United States Attorney.

40.     The Applicant continued to closely monitor the operations of the Debtor during this time period and to otherwise discuss the status of this matter with creditors and the Debtor.  The Applicant met with the Debtor to assist the Debtor in the preparation of the monthly operating reports.  The Applicant would then arrange to file such reports with the Court.

## THE APPLICANT

41.     The Applicant has been involved in all phases of bankruptcy matters during the past 41 years both as an attorney with a law firm and in public service. The Applicant has represented both debtors and creditors in a substantial number of Chapter 7 and Chapter 11 proceedings. The Applicant clerked for Bankruptcy Judge John Galgay of the Southern District of New York.  The Applicant has mostly been involved in representing debtors in the past several years but has also been involved in representing creditors.

42.     Susan Adler is an attorney who has been admitted in New York since 1995 and in New Jersey since 1993 whose practice is primarily litigation. Stephanie Wessel is an attorney admitted in New York since 2009 and also practices bankruptcy law.  Robert Fox is an attorney admitted in New York since 2008 and also practices bankruptcy law.

## THE APPLICANT'S FEE REQUEST

43.     The Applicant has rendered a total of 1,275.6 hours in this case for period July 2015 through and including April 2018 for a total of $485,330 in fees. The Applicant has incurred out-of-pocket disbursements in the amount of $2,261.96.   Applicant is thus seeking an award of $487,591.96 in fees and disbursements.  The Applicant has been paid to date the sum of $12,500 as a pre-petition retainer.  There is presently due the sum of $475,091.96 in fees and disbursements for additional services to be rendered after deducting all payments made to the Applicant.  This amount does not include the post-confirmation services regarding the tax lien objections and

litigation.

44.    These services were rendered in connection with, and as part of, the Chapter 11 proceedings. Annexed hereto is a summary of the time incurred by Applicant with a break-down of fees by project category - **Exhibit B**.    **Exhibit C** is a summary of time incurred by Applicant in chronological order during the Compensation Period.    **Exhibit D** is a summary of time with a breakdown of fees by professional during the Compensation Period.  Disbursements incurred in this matter during the Compensation Period are listed on **Exhibit E**.

45.    All services were rendered by Leo Fox, Esq. at an hourly rate of $450.00 an hour, Susan Adler, Esq. associate, at an hourly rate of $275.00 per hour and Carol Brennan, Paralegal, at an hourly rate of $75.00 per hour.  The Applicant believes that Applicant's hourly rates are reasonable and certainly on the low side, in light of today's realities in operating a law office and the cost of comparable attorneys with Applicant's experience and background. The Applicant's hourly rates are significantly less than those of other practitioners with experience who practice in the Bankruptcy Court.

## CERTIFICATION

46.    The Applicant states that this motion complies with the mandatory guidelines set forth herein, and that the fees and disbursements fall within these guidelines, and that the fees and disbursements are billed at rates and in accordance with the practices customarily employed by the Applicant and generally accepted by the Applicant's clients, the overwhelming majority of which are involved in bankruptcy proceedings.

47.    I have read this Fee Application. To the best of my knowledge, information and belief formed after reasonable inquiry, the fees and disbursements sought fall within these Amended Guidelines and the U.S. Trustee Guidelines, except as specifically noted herein.

48.     Except to the extent that fees or disbursements are prohibited by these Amended Guidelines or the U.S. Trustee Guidelines, the fees and disbursements sought are billed at rates and in accordance with practices customarily employed by Applicant.

49.     The Applicant certifies that disbursements, including charges for facsimile transmission and secretarial overtime, are billed at rates in accordance with practices customarily employed by the Applicant and generally accepted by Applicant's clients. Applicant certifies that the total charges for outgoing facsimile transmissions is not readily determinable and Applicant requests payment for incoming facsimile transmissions only, at a rate of 20¢ per page.

50.     Applicant further certifies that Applicant has not sought reimbursement for any expenses incurred in connection with cellular telephone charges or daytime or evening meals.

51.     Applicant further certifies that in providing for reimbursable services, Applicant does not make a profit on that service; Applicant does not include, in the amount for which reimbursement is sought, the amortization of the cost of any investment, equipment, or capital outlay; and in seeking reimbursement for services which Applicant justifiably purchased or contracted from the third party, the Applicant requests reimbursement only for the amount billed to the Applicant by the third-party vendor and paid by the Applicant to such vendor.

52.     It is further certified that this Fee Application has been or will be delivered to the United States Trustee, to the Debtor, and any creditor requesting a copy of same. Furthermore, it is certified that the Debtors were provided with periodic bills, depending on billing procedures, containing a detailed explanation of services and disbursements as and when prepared and disseminated by the Applicant's office and as requested by the Debtor.  These bills provide a list of the hours, detailed description of services, and breakdown of disbursements incurred in connection with the case.

53.     The following items are included by Applicant in its overhead expense and are not billed separately and additionally: ordinary secretarial, local telephone (in most cases long distance calls unless extraordinary), and all other items which are incurred in the operation of the business.

54.     Disbursements, which vary depending on the client, are always billed separately to each client. These consist of transcript fees, messenger fees, photocopy charges (at $.10 per page) (fax transmissions (at $.20 per page), postage, express mail and overnight mail, all filing fees and search fees (such as UCC-1 search fees) and travel. These are the actual out of pocket cost to the Applicant.

55.     As a general matter, it is the opinion of the Applicant that the disbursements tend to be understated because the Applicant's office physically cannot track each and every disbursement. No adjustment was made for this however.

## VALUATION OF SERVICES

56.     Pursuant to § 330 of the Bankruptcy Code, the general standards for determining the amount of compensation are to be:

> "[R]easonable compensation for actual, necessary services rendered by such...professional person, or attorney...and by any paraprofessional persons...based on the nature, the extent, and the value of such services, the time spent on such services, and the cost of comparable services other than in a case under this title..."

57.     The factors traditionally followed in quantifying "reasonable compensation" under the standard of § 330(a)(1) of the Bankruptcy Code were derived from the seminal decision in _Johnson v. Georgia Highway Express, Inc_., 448 F.2d 714 (5th Cir. 1974), which enunciated the so-called "twelve" Johnson factors.  The more recent case condensing said twelve factors was enunciated in _In re Penn-Dixie Industries, Inc_., 18 B.R. 834 (Bankr. S.D.N.Y. 1982). There the court stated that three basic factors should be considered in determining a fee award: (1) the quality factor; (2) the quantity factor; and (3) the results factor. S_ee also In re Cuisine Magazine, Inc_., 61

B.R. 210 (Bankr. S.D.N.Y. 1985); *Matter of Ferkauf, Inc.*, 42 B.R. 852 (Bankr. S.D.N.Y. 1984).

58.    In *In re Shades of Beauty, Inc.*, 56 B.R. 946 (Bankr. E.D.N.Y. 1986) the court stated as follows:

> "The interests of effective bankruptcy administration require that professional fees be designed not only to discourage the incompetent, but also to encourage the competent...To achieve this end, compensation must be sufficient in amount to induce counsel to undertake the labors incident to an insolvency proceeding in reliance on the willingness of the court fairly to fix a proper fee." *Supra* at 952.

59.    Except as provided herein, no prior application for compensation has been filed.

60.    Applicant submits that given (a) the time and labor required of Applicant; (b) the skill required of Applicant to perform the services involved; (c) the firm's customary fees for such work; (d) Applicant's experience, reputation, and ability; and (e) the results obtained, the compensation sought in this application is fair and reasonable.

## CONCLUSION

**WHEREFORE**, the Applicant submits that its services were beneficial to the administration of the Debtors' estate so far in this case and it is entitled to a final fee for the Compensation Period, in the amount of $485,330 in total fees plus $2,261.96 in expenses.  It is respectfully requested that the Court award the fees and disbursements requested in this Fee Application and grant such other and further relief as is proper.

Dated: New York, New York
        May 7, 2017

Respectfully submitted,

*/s/ Leo Fox*
Leo Fox, Esq.
Attorney for Debtor-in-Possession
630 Third Avenue, 18th Floor
New York, New York 10017
(212) 867-9595
leo@leofoxlaw.com